**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Solar Optimum Incorporated, | No. CV-23-00135-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Elevation Solar LLC, et al., | |
| Defendants. | |

Pending before the Court are Defendants Greg Andersen and Jameson Dequinia's Motion to Dismiss Second Amended Complaint ("SAC") (Doc. 43) and Fasullo Defendants' Rule 12(b)(6) Motion to Dismiss Second Amended Complaint (Doc. 52). Responses (Doc. 50; Doc. 56) and replies (Doc. 55; Doc. 59) have been filed. The Court has considered the pleadings and relevant case law and will deny both Motions.

I.   **FACTUAL BACKGROUND**

These Motions pertain to an ongoing dispute between Plaintiff, Solar Optimum Incorporated ("SOI") and Defendant Elevation Solar, LLC ("Elevation") and its executives, Greg Fasullo (Chief Executive Officer), Greg Andersen (Chief Operating Officer), Jameson Dequinia (Chief Product Officer) and Emmitt Summers (Executive Vice President). (Doc. 50 at 3.) Plaintiff alleges that these Defendants engaged in "concerted conduct" to misappropriate SOI's confidential information and trade secrets by working with SOI employees—including Mark Howe and Arturs Reirs to obtain this data and solicit other SOI employees to leave SOI for Elevation. (*Id.*) The SAC includes several years of

1   events which led to these claims.  The Court will recount pertinent events here.

2        In October of 2020, Mark Howe and his son, Ryan Howe, had an in-person meeting

3   with Fasullo in Newport Beach, California.  (Doc. 32 at 11 ¶ 40(a).)  At the time, Elevation

4   had no offices in California, but the Howes were informed that the company was wanting

5   to build out the business there and thought the Howes would be a good fit for the expansion.

6   (*Id.*)  Following the meeting, Fasullo emailed Mark Howe discussing next steps.  (*Id.*)

7   Summers then sent Mark Howe a model to use to "train, develop, and or manage sales

8   coordinators" once he joined Elevation.  (*Id.* at (c).)  In November 2020, Plaintiff alleges

9   that Mark Howe sent a signed non-disclosure agreement ("NDA") nearly identical to his

10  NDA with SOI, which contained SOI document identifiers that were then changed by

11  Summers.  (*Id.* at (d).)  He then returned this copy of the NDA to Mark Howe to distribute

12  to the other employees they were attempting to hire.  (*Id.*)  Plaintiff alleges that following

13  the NDA, Mark Howe "repeatedly access trade secret files of SOI."  (*Id.* at (e).)  Plaintiff

14  alleges that Mark Howe created new documents using this data and accessed this saved

15  data via a portable USB that he saved to his personal computer.  (*Id.* at (f).)  Subsequently,

16  Mark and Ryan Howe attended a panel interview with Fasullo, Andersen, Dequinia and

17  other executives.  (*Id.* at (h).)  Plaintiffs allege Mark Howe discussed "SOI's use and

18  configurations of its Customer Relationship Management ("CRM") database at this panel.

19  (*Id.* at (g).)  Howe received an offer from Elevation and was tasked with disseminating

20  offer letters to others to be hired, including Ryan.  (*Id.* at (h).)

21       Plaintiffs allege that Howe accepted his offer with Elevation, and on December 1,

22  2020, while still employed with SOI, "downloaded SOI's trade secret sales information,

23  including but not limited to, price lists, leads for prospective clients with notations of

24  preferences, and similarly critical trade secret information, from his company-issued

25  computer to his personal email account."  (*Id.* at (k).)  Mark and Ryan Howe then turned

26  in their resignation letters to SOI in the next two days.  (*Id.* at (m)-(n).)

27       Following these resignations, Plaintiff alleges that Mark Howe reached out to Reirs

28  while he was still employed with SOI asking for Reirs's CRM login so he could "provide

the Elevation executives with an overview of how a good CRM was set up." (*Id.* at (o.)). Reirs gave him this login, and after Howe's meeting with the executives, Plaintiff alleges he told Reirs that he showed the executives SOI's CRM. (*Id.* at (p).)

Plaintiff alleges that also in December 2020, Fasullo, knowing he was using Reirs's login, asked Mark Howe if he could gain access to SOI's Salesforce database to show him the account set up. (*Id.* at (q).) Mark Howe allegedly voiced concern over getting caught to which Fasullo replied not to worry because "Elevation has bad ass attorneys." (*Id.*) The Howes then accessed the Salesforce account using Reirs's login an additional thirty times and downloaded confidential information to their personal devices. (*Id.* at (r).) Reirs subsequently accepted employment with Elevation, but he also began accessing SOI data and saving it to personal flash drives. (*Id.* at (t)-(v).)

Plaintiff alleges that on January 14, 2021, "Fasullo again directed Mark Howe to obtain and use Reirs's login credentials to access SOI's CRM database so he could walk Fasullo, Andersen, and Dequinia through SOI's Salesforce account while it was hooked up to a television. On information and belief, Elevation executives Fasullo, Andersen, and Dequinia were on notice and knew or should have known of the wrongful conduct in directing Mark Howe to obtain access to SOI's CRM database and in viewing SOI's Salesforce account." (*Id.* at (w).)

Plaintiff further alleges that between October 2020 and his resignation in December, Mark Howe bad-mouthed SOI in the presence of those he supervised, told Reirs's that he wanted to "take every single one of [them]" to Elevation, and created a document on an SOI computer outlining why employees should leave SOI. (*Id.* at 18–20.) Mark Howe also hosted a "gathering at his residence which was attended by several then-current and former SOI employees, and wherein [he] and Emmitt Summers presented a slide show pitch with reasons to join Elevation" some of which included information which would only be available through accessing SOI's confidential or trade secret information. (*Id.* at 21 ¶ 58.) Mark Howe contacted certain employees after thanking them for attending the pitch. (*Id.* ¶ 59.) Following this meeting, several additional SOI employees left to join

1    Elevation.  (*Id.* ¶ 60.)

2        After learning about these events, SOI sent then Elevation CEO a letter informing

3    him of these breaches, which was allegedly ignored.  (*Id.* at 5 ¶ 16.)  SOI also sent a cease-

4    and-desist letter, which they allege Howe and Reirs were also instructed to ignore.  (*Id.* at

5    6 ¶ 18.)  Plaintiff now brings claims against Elevation and several individual Defendants.

6    At issue here are the claims against Andersen, Dequinia and Fasullo, which these

7    Defendants have moved to dismiss.  (Doc. 43; Doc. 52.)

8    **II.    LEGAL STANDARD**

9        To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet

10   the requirements of Rule 8(a)(2).  Rule 8(a)(2) requires a "short and plain statement of the

11   claim showing that the pleader is entitled to relief," so that the defendant has "fair notice

12   of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*,

13   550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This exists

14   if the pleader sets forth "factual content that allows the court to draw the reasonable

15   inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556

16   U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported

17   by mere conclusory statements, do not suffice."  *Id.*  Plausibility does not equal

18   "probability," but requires "more than a sheer possibility that a defendant has acted

19   unlawfully."  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a

20   defendant's liability, it 'stops short of the line between possibility and plausibility'".  *Id.*

21   (quoting *Twombly*, 550 U.S. at 557).

22       Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory

23   or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v.*

24   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  A complaint that sets forth a

25   cognizable legal theory will survive a motion to dismiss if it contains sufficient factual

26   matter, which, if accepted as true, states a claim to relief that is "plausible on its face."

27   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

28       In ruling on a Rule 12(b)(6) motion to dismiss, the well-pled factual allegations are

taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings in ruling on a Rule 12(b)(6) motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider materials— documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

## III. DISCUSSION

### A. Federal and State Trade Secret Claims

"Trade secret" is a defined term under both Arizona and United States statutes. *See* Ariz. Rev. Stat. § 44-401(4); 18 U.S.C. § 1839(3). Both statutes define the term broadly. *Id.* The federal statute, 18 U.S.C. § 1839(3) reads:

> (3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

The state statute, Ariz. Rev. Stat. § 44-401(4) reads:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from

its disclosure or use.
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Arizona's definition is adopted from the "Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common law trade secret protection." *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 (Ariz. Ct. App. 2013). Under the Arizona Uniform Trade Secret Act ("AUTSA"), Plaintiff must prove two elements: (1) the existence of a trade secret, and (2) actual or threatened misappropriation. *See Calisi*, 302 P.3d at 631–32; *Miller v. Hehlen*, 104 P.3d 193, 201 (Ariz. Ct. App. 2005). In the absence of a conflict, the Court can rely on common law principles to interpret the statute. *Calisi*, 302 P.3d at 631. To have a potential claim, the subject matter of the allegedly misappropriated information must be both a secret and the owner must have made reasonable efforts to keep the information secret. *Id.* "[T]he most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Enter. Leasing Co. of Phx. v. Ehmke*, 3 P.3d 1064, 1070 (Ariz. Ct. App. 1999).

Misappropriation is defined as either:
(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means
(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:
(i) Used improper means to acquire knowledge of the trade secret.
(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.
(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ariz. Rev. Stat. § 44-401(2). The definition in the federal statute is almost identical. *See* 18 U.S.C. § 1839(5). "Acquire means 'to come into possession, control, or power of disposal of.'" *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010) (quoting

Webster's Third New Int'l Dictionary 18 (3d ed. 1993)).

Here, all three Defendants argue that Plaintiff's trade secrets claim should be dismissed for failure to identify any specific trade secret.  (Doc. 43 at 5; Doc. 52 at 2.)  In identifying a trade secret, Plaintiff is required to describe "the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."  *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (cleaned up).  Here, Plaintiff describes trade secrets in paragraph 31, accessible to Howes and Reirs as "customer-related information (such as customer lists, prospect lists, and other information regarding clients or prospects containing names of the client contact person and key decision makers, contact information, preferences, and other personal information, and client profiles, needs, habits, specifications, prior transaction history with SOI, and correspondence)" (Doc. 32 at 8 ¶ 31.); "information developed, created, compiled, or maintained by the Former SOI Employees during their employment with SOI relating to SOI's business, clients, prospects, vendors, and referral sources; the methods and systems used by SOI in soliciting, marking, selling, and providing its products and services to its clients; financial and accounting information, such as budgets, cost, rates, pricing and billing information, revenues, profit margins, unpublished financial statements, forecasts and projections; sales and marketing plans and strategies; research and development and strategic business plans; personnel information of SOI's employees (including inside information regarding SOI's employees and their current positions with SOI, their contact information, and compensation structure, the identity of SOI's best and key employees, and other private and confidential information of SOI's employees)" (*Id.*) and "employment and recruiting strategies, processes, and compensation plans, including but not limited to key performance metrics; and other business[es]' information disclosed to the Former SOI Employees by SOI either directly or indirectly in writing or orally."  (*Id.*)

More specifically, as to how this information was used by Defendants, Plaintiff alleges "Mark Howe created new documents using SOI's sales data and insights from

SOI's 'EV Sales Meeting' file, removing SOI's logo, but otherwise keeping all the data." (*Id.* at 12 ¶ 40(f)). Plaintiff further alleges that "Mark Howe downloaded SOI's trade secret sales information, including but not limited to, price lists, leads for prospective clients with notations of preferences, and similarly critical trade secret information, from his company-issued computer to his personal email account." (*Id.* at 13 ¶ 40(k)). Plaintiff also alleges that "Mark Howe modified SOI's confidential sales information reports, which included key performance details company-wide down to each salesperson." (*Id.* at 14 ¶ 40(l)). These allegations sufficiently allege trade secret information that is separate from matters of general knowledge. Despite this, the Fasullo Defendants rely on *Imax*, 152 F.3d 1161 and *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) to argue that something even more specific is necessary. However, "unlike *Imax* and *MAI*, which involved summary judgment rulings upon the merits of misappropriation claims, at the pleading stage [plaintiff] merely must state a claim for relief 'that is plausible on its face.'" *Modus LLC v. Encore Legal Solutions, Inc.*, No. CV-12-00699-PHX-JAT, 2013 WL 6628125, at *7 (D. Ariz. Dec. 17, 2013) (quoting *Twombly*, 550 U.S. at 570). Accordingly, the Court finds that at this stage in the proceedings, Plaintiff has plausibly alleged the taken information was a trade secret.

Next, all Defendants argue that the SAC fails to allege misappropriation. Fasullo, Andersen and Dequinia argues that at most, they were shown a trade secret during a panel interview and meetings. (Doc. 43 at 5; Doc. 52 at 8.) However, the Court finds that the SAC alleges much more than that. Specifically, in paragraphs 38, 40 and 42, Plaintiff describes how Fasullo specifically directed Mark Howe to access Plaintiff's trade secret information before and after he left SOI. (Doc. 32 at 10–11 ¶¶ 38–42.) Plaintiff alleges that after Mark Howe left SOI, Fasullo directed him to use another SOI employee's credentials to access trade secret information and explain that information to him, Andersen and Dequinia. (*Id.*) The SAC goes on to allege that each of these Defendants has "possessed and used SOI's Confidential/Trade Secret Information obtained." (*Id.* at 11 ¶ 42.) Alternatively, Fasullo, Andersen and Dequinia argue that they never acquired the

ill-gotten information. This argument is ridiculous. Each of these individual defendants are executives at Elevation. Elevation hired Mark Howe and each of these individual defendants participated in persuading Mark Howe to misappropriate the trade secret information for Elevation's use. Just because they did not use the false credentials to access the information themselves, it does not absolve them of having acquired the information. They had control over Mark Howe—their employee—and thus had control over the information.

In an attempt to isolate himself from this claim, Fasullo argues that Plaintiff impermissibly used "group pleadings" by referring to defendants as a group instead of individually, which requires dismissal. (Doc. 59 at 3); *see also Sheldon v. Fletcher*, No. CV-19-00417-TUC-JAS, 2020 WL 13546638, at *2–3 (D. Ariz. Apr. 30, 2020). The Court disagrees. Unlike in *Sheldon*, Plaintiff here does outline each individual Defendant's participation in the actions underlying the SAC. Although Plaintiff does at times refer to "individual defendants" and "defendants" as a group, Plaintiff specifically identifies each Defendant's individual participation in an event or meeting before grouping them together. In context of the whole SAC, it is clear what Plaintiff alleges each Defendant to have done. Additionally, the Court is not persuaded by Defendant Fasullo's argument that the SAC does not adequately plead damages as required for a trade secret misappropriation claim. *See Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054–55 (D. Ariz. 2010). As Plaintiff notes it its response, SOI specifically pleads that the trade secret's misappropriation resulted in undercutting SOI's pricing, which allegedly resulted in millions of dollars in damages. (Doc. 56 at 8.) It is not before the Court at this stage in the pleadings to determine which portion of these damages, if at all, were a result of Fasullo's conduct in the misappropriation claim. Plaintiff only needs to state that the misappropriation led to damages. Accordingly, the Court finds that the SAC sufficiently alleges that each of these Defendants misappropriated the trade secrets.

### B. State Law Claims

Defendant Fasullo argues that the Court should dismiss all state law claims to the

extent they are based on misappropriation of trade secrets because those claims are preempted by the AUTSA and the federal Defend Trade Secrets Act ("DTSA").  In making this argument, Fasullo relies on *Smoketree Holding LLC v. Apke*, No. CV-22-02123-PHX-DLR, 2023 WL 6377272 (D. Ariz. Sept. 29, 2023).  In *Smoketree*, the Court held that *tort claims* based on the misappropriation of trade secrets are preempted.  *Id.* at *2.  As Plaintiff points out, Ariz. Rev. Stat. § 44-407 specifically outlines that the AUTSA does not displace contractual remedies.  (Doc. 56 at 10.)  Additionally, the AUTSA does not preempt claims based on misappropriation of confidential information that does not meet the definition of a trade secret.  *Orca Commc'ns Unltd., LLC v. Noder*, 337 P.3d 545, 547–548 (Ariz. 2014).

Here, Plaintiff's response describes how the SAC's state law claims are based on much more that misappropriation of trade secrets.  (Doc. 56 at 10.)  The state law claims relate to Defendants' improperly soliciting SOI employees, tortiously interfering with SOI's contractual relationships its customers, and misappropriating confidential information.  (*Id.*)  These claims, which are both tort and misappropriation based, are separate and distinct from the kind that would be otherwise preempted by the DTSA or the AUTSA.  Therefore, the Court finds that a blanket finding of preemption is not warranted and will not dismiss the state law claims on that basis.  Instead, the Court will analyze whether SOI adequately pleads each claim.

### i.     Aiding and Abetting Breach of Fiduciary Duty/Duty of Loyalty

Plaintiff brings a claim of aiding and abetting breach of fiduciary duties against all Defendants.  (Doc. 32 at 24.)  "[I]n Arizona, an employee . . . owes his or her employer . . . a fiduciary duty," which includes a duty of loyalty.  *McCallister Co. v. Kastella*, 825 P.2d 980, 982–83 (Ariz. Ct. App. 1992).  "Consistent with the fiduciary duty of loyalty, an employee may not, absent agreement to the contrary, statute or other authority, compete with his or her employer concerning the subject matter of the employment."  *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008).  Plaintiff alleges that Mark Howe and Reirs violated this duty by competing with SOI and recruiting SOI employees away to Elevation.  (Doc. 32 at 25 ¶ 80.)  Plaintiff further alleges

that Andersen, Dequinia and Fasullo aided and abetted this breach, which is a separate tort claim. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 23 (Ariz. 2002). To bring a cognizable claim for aiding and abetting a tort a plaintiff must plead that (1) the primary tortfeasor committed a tort that caused injury to the plaintiff; (2) the defendant knew that the primary tortfeasor's conduct constituted a breach of duty; and (3) the defendant substantially assisted or encouraged the primary tortfeasor in this breach. *Id.*

Defendants argue that Plaintiff fails to plead these elements. More specifically, all Defendants argue that Plaintiff's aiding and abetting claim should be dismissed because the SAC contains no allegations showing a causal relationship between Defendants conduct and the Howes' or Reirs's breaches. (Doc. 43 at 10; Doc. 52 at 13.) They further allege that the SAC does not show how either Defendant encouraged Howes or Reirs to breach their fiduciary duties. (Doc. 43 at 10; Doc. 52 at 13.) The Court disagrees. Plaintiff pleads these elements in paragraphs 79 through 87 of their SAC, and further allege facts throughout the whole SAC that speak to these elements.

As to the first element, Plaintiff notes that the Howes and Reirs engaged in a tort that resulted in injury—soliciting SOI employees to join Elevation and gaining access to SOI systems without consent. (Doc. 32 at 25 ¶¶ 79–82.) To the second element, Plaintiff alleges that Defendants knew this type of conduct would be a breach in the Howes' and Reirs's duty of loyalty to SOI. (*Id.* ¶¶ 80, 83.) To the third element, Plaintiff alleges that Defendants encouraged both of these actions through their recruiting efforts and subsequent communications with Mark Howes and Reirs. (*Id.* at 10 ¶ 38; 18 ¶ 45–56.) Simply put, Plaintiff's entire SAC when taken together supports that Defendants had knowledge of, and action toward, aiding and abetting Mark Howe and Reirs in soliciting SOI employees to Elevation and accessing SOI's corporate information without its consent. Both of these alleged actions may constitute a breach of fiduciary duty under Arizona law. *See Pope*, 200 P.3d at 989–90.

ii.      **Civil Conspiracy**

- 11 -

It is unclear if Plaintiff is alleging civil conspiracy under state or federal law. However, the Court finds the SAC survives Defendants' Motions under either standard. Under Arizona law, "[f]or a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Wells Fargo Bank,* 38 P.3d 12, 36 (Ariz. 2002). Under 42 U.S.C. § 1985(3), "a plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *deParrie v. Hanzo*, No. CIV. 99-987-HA, 2000 WL 900485, at *3 (D. Or. Mar. 6, 2000).

Defendants Andersen and Dequinia allege that nothing in the SAC, even taken as true, proves that they agreed to participate in a tort. (Doc. 43 at 11.) They argue the SAC simply alleges that "[t]hey just sat in two meetings." (*Id.*) Again, the Court finds that this is an oversimplification of how the SAC, read as a whole, alleges that these two Defendants engaged in a conspiracy. Essentially, as Plaintiff points out, these Defendants continue to argue that the SAC fails to allege that they had the requisite knowledge or intent to be part of the solicitation of employees or use of SOI systems without its consent. (Doc. 52 at 14 n.8.) The Court agrees. Throughout this Order, the Court has noted how, when taken together, there are more than enough facts to allege knowledge and intent for purpose of the claims which require it. Defendants are correct that "[m]ere suspicious cooperative activity" is insufficient to support a conspiracy claim. *Dawson v. Withycombe*, 163 P.3d 1034, 1054 (Ariz. Ct. App. 2007). However, by alleging that Andersen and Dequinia knew of wrongful conduct, and "continued to authorize, encourage, and/or permit the Howes and Reirs to commit the wrongful acts alleged herein, as well as the wrongful act of directing the Howes and Reirs to commit those acts" (Doc. 32 at 17 ¶ 40) they sufficiently allege more than cooperative activity —they allege operating activity which is enough to support a conspiracy claim under both Arizona or federal law.

Similarly, Defendant Fasullo argues the SAC is insufficient to plead a conspiracy claim against him because the allegations are too generalized. (Doc. 52 at 14.)  Again, the Court disagrees.  Despite Defendants' contention, Plaintiff gives a detailed timeline on when it believes Fasullo, Andersen and Dequinia to have engaged in, or conspired in, the wrongful agreement underlying these claims when the allegedly misappropriated data was accessed following this meeting, as well as when employees left SOI.  (Doc. 32 at 3 ¶ 7–8; 11 ¶ 40.)  It is unreasonable at this stage in the pleadings to have more evidence than what is alleged in the SAC.  And if the SAC is taken as true, the facts taken together are enough to bring a conspiracy claim against all Defendants here.

### iii.    Tortious Interference with Contract

Plaintiff next brings claims against all Defendants for tortious interference with contract. (Doc. 32 at 27.)  To have a cognizable claim for interference with a contract a plaintiff must plead: "(1) the existence of a valid contractual relationship or business expectancy; (2) defendant's knowledge of the relationship or expectancy; (3) defendant's intentional interference in inducing or causing the breach; (4) defendant's interference must be improper; and (5) resulting damages." *Wolf Designs LLC v. Five 18 Designs LLC*, 635 F. Supp. 3d 787, 799 (D. Ariz. 2022).  The plaintiff "must also prove the defendant acted with improper motive or improper means." *Directory Assistants, Inc. v. Does 1-10*, No. MC 11-00096-PHX-FJM, 2011 WL 5335562, at *3 (D. Ariz. Nov. 4, 2011).

Defendants argue Plaintiff's claim should be dismissed because the SAC fails to plead facts that support these elements.  Specifically, Andersen and Dequinia argue that the SAC fails to plead knowledge or improper motive. (Doc. 43 at 7.)  Fasullo argues the claim should be dismissed because the SAC does not describe any specific terms in SOI's employment contract that he interfered with. (Doc. 52 at 10.)  The Court will address these arguments in turn.

First, the Court is not persuaded by Defendant's argument that they lacked intent or knowledge of the breach of contract.  Plaintiff's SAC, as noted throughout this Order, provides a well outlined timeline walking through the facts as it relates to the Defendants

working as a group to create and implement a plan to poach SOI's employees and corporate data. (Doc. 32 at 11 ¶ 40.) The Court has already rejected the argument that the SAC does not support that Andersen, Dequinia, and Fasullo had knowledge of Mark Howe's and Reirs's conduct.

Next, the Court is also not persuaded by Defendant Fasullo's argument that Plaintiff fails to plead the existence of a contractual provision that was breached. (Doc. 52 at 10–11.) The SAC pleads that Defendants interfered with "[employee's] contracts with SOI." (Doc. 32 at 5 ¶ 16.) Defendant Fasullo argues that this is too vague to sufficiently allege the existence of a contractual provision for an interference with contract claim. (Doc. 52 at 10–11.) The Court disagrees. Plaintiff repeatedly references the employment contracts throughout the SAC, and attach Howe's and Reirs's contracts to its response which the Court may consider in ruling on these Motions. *See Ritchie*, 342 F.3d at 908 (holding that a document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim"). The contracts both contain provisions related to disclosure of trade secret information and non-compete clauses. (Doc. 56-2 at 2–5; Doc. 56-3 at 2–5.) Further, as Plaintiff notes in its response, "the notion that a sophisticated CEO of a $40 million company is unaware that competitors require their employees to maintain the secrecy of their confidential and trade secret information strains credulity." (Doc. 56 at 12.) It is disingenuous to argue that Plaintiff's SAC does not plausibly plead the existence of such a contractual provision, or that Fasullo did not have knowledge of such a provision, In short, SOI has a reasonable basis for this tortious interference claim. *See Iqbal*, 556 U.S. at 678 (the Court need only be able to draw a "reasonable inference that defendant is liable for the alleged misconduct"). Accordingly, the Court will not dismiss Plaintiff's interference with contract claim as to any Defendant.

### iv.   Tortious Interference with Business Expectancy

Plaintiff also brings a tortious interference with business expectancy claim against all Defendants. (Doc. 32 at 28.) Under Arizona law, a claim for intentional interference

with a business relationship or business expectancy requires proof of (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional and improper interference inducing or causing a breach or termination of the relationship or expectancy; and (4) damage to the party whose relationship or expectancy has been disrupted.  *Wagenseller v. Scottsdale Mem'l Hosp.,* 710 P.2d 1025, 1041 (Ariz. 1985), *superseded by statute in other respects*, A.R.S. § 23-1501, *as recognized in Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1024 (9th Cir. 2000); *see also Hill v. Peterson*, 35 P.3d 417, 420 (Ariz. Ct. App. 2001).[1]

All Defendants argue this claim should be dismissed because Plaintiff's SAC fails to "identify a specific relationship with which the defendant interfered."  (Doc. 43 at 8) (citing *Marmis v. Solot Co.*, 573 P.2d 899, 902 (Ariz. Ct. App. 1977)).  More specifically, Defendants allege that relationships with prospective customers are insufficient relationships to sustain an interference with business expectancy claim.  (*Id.*)  This may generally be true where the alleged group of prospective customers is vague, however, where a plaintiff can provide a specifically identifiable group, they may be able to sustain a claim.  *See Dube v. Likins*, 167 P.3d 93, 101 (Ariz. Ct. App. 2007) (recognizing that an interference with business expectancy claim may be sustained where specific third parties are specifically identifiable).

Here, SOI's SAC provided identifiable customers whom Defendants obtained confidential information about using SOI's systems.  (Doc. 32 at 13 ¶ 40 (k)) ("Mark Howe downloaded SOI's trade secret sales information, including but not limited to, price lists, *leads for prospective clients with notations of preferences*, and similarly critical trade secret information, from his company-issued computer to his personal email account.").  Simply put, SOI's SAC pleads Defendants infringed on more than a "hope" of obtaining a customer.  *See Marmis*, 573 P.2d at 902.  The SAC alleges that Defendants wrongfully obtained confidential, specific, information about actual *and* prospective customers to

---

[1]  Some authorities describe the tort as having five elements, but the substance is substantially the same and follows the Restatement (Second) of Torts.  *See Wells Fargo*, 38 P.3d at 31; *Plattner v. State Farm Mut. Auto. Ins. Co.*, 812 P.2d 1129, 1133 (Ariz. Ct. App. 1991).

convert both groups to Elevation customers at the detriment of SOI.  So, although *Marmis* may support the proposition that "[t]ortious interference does not occur through lawful competition," lawful competition is not what Plaintiff is alleging happened here.  *Id.*

The Court will also not entertain Defendants' argument that they did not know about these relationships and therefore they could not have improperly interfered with them. (Doc. 43 at 9.) As explained throughout this Order, Plaintiff, through the SAC's detailed timeline, sufficiently pleads both knowledge and intent.  (Doc. 32 at 11–17 ¶ 40 (a)–(z).) Those same facts support intent and knowledge under this claim as well.  Accordingly, the Court will not dismiss Plaintiff's interference with business expectancy claim as to any Defendant.

### v.   Unfair Competition

Finally, Plaintiff brings a claim for unfair competition against all Defendants.  "The common law doctrine of unfair competition is based on principles of equity."  *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998).   This claim encompasses several tort theories, including misappropriation.  *Id.*  "The general purpose of the doctrine is to prevent business conduct that is 'contrary to honest practice in industrial or commercial matters.'"  *Id.* (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974).

Plaintiff alleges that by "conspiring with the Howes and Reirs to prepare to compete with SOI while the Howes and Reirs were still employed by SOI, recruiting or supporting the recruiting of SOI's employees, and conspiring with and encouraging the Howes and Reirs to access SOI's CRM and computer network though Defendants were not authorized to access such computer systems" Defendants engaged in unfair competition that resulted in damages to Plaintiff.  (Doc. 32 at 29 ¶ 111.)  Defendants argue that Plaintiff fails to implicate any of the recognized unfair competition theories, "except misappropriation, but that is not the apparent theory underlying SOI's purported unfair competition claim." (Doc. 43 at 11; Doc. 52 at 15.)  The Court disagrees.  As stated earlier in this Order, Plaintiff sufficiently alleged misappropriation in its SAC.  Plaintiff incorporated all facts previously

pled in the SAC into its unfair competition claim.   (Doc. 32 at 29 ¶ 110.)   It is not unreasonable that the unfair competition claim is based on the misappropriation claim. Accordingly, the Court will not dismiss Plaintiff's unfair competition claim as to any Defendant.

**IV.    CONCLUSION**

   **IT IS ORDERED denying** Defendants Greg Andersen and Jameson Dequinia's Motion to Dismiss Second Amended Complaint (Doc. 43).

   **IT IS FURTHER ORDERED denying** Fasullo Defendants' Rule 12(b)(6) Motion to Dismiss Second Amended Complaint (Doc. 52).

   Dated this 3rd day of May, 2024.

Honorable Susan M. Brnovich
United States District Judge